UNITED STATES, Appellee

v

THEODORE T. HOLT Basic Airman, U. S. Air Force, Appellant

7 USCMA 617, 23 CMR 81

No. 8430

Decided March 1, 1957

██

*Major George M. Wilson* argued the cause for Appellant, Accused. With him on the brief were *James J. Laughlin, Esq.,* and *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Captain Robinson O. Everett.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Basic Airman Theodore T. Holt was convicted by general court-martial in August 1955, at Chateauroux Air Depot in France for eight specifications laid under Article 134 of the Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, total forfeitures and confinement at hard labor for thirty-two months. The convening authority approved only so much of the sentence as provides for a bad-conduct discharge, total forfeitures, and confinement at hard labor for one year. The board of review, one member dissenting, set aside that portion of the approved sentence in excess of the bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months. The case is now before this Court on the issues of whether or not the specifications allege offenses under the Uniform Code of Military Justice.

The accused, while working at an airmen's mess in France as a "croupier"—for a gaming operation known as bingo—on several occasions so manipulated this game of chance that chance no longer existed as a factor in the game. According to the accused's statement, an idea came to him that it would be possible to " 'fix' the Bingo games in order that a certain person would win and that I could make some money out of it. The idea . . . was to memorize certain numbers on the person's card while visiting his table either prior to the games or during intermission and then calling those numbers during a succeeding game. As the balls rolled out from the basket I would pick them up and regardless of the number appearing on the face of the ball I would call whatever number was needed in order that the chosen person would Bingo. I would collect half of the winnings from the person who won either during intermission or after the game, or on succeeding days. On several occasions, I have given people in the audience the money to purchase a card for me and play the card for me during the game." The "idea" which pioneered this scheme resulted in the eight specifications being laid against the accused. Four of the specifications —1, 3, 5, and 7—in pertinent part allege that the accused, "while employed as Bingo caller for the Chateauroux Airmen's Open Mess" did "wrongfully and unlawfully award" bingo prizes to various individuals "by memorizing and calling winning numbers on the Bingo card . . . without regard to the numbers actually drawn." The remaining four specifications—2, 4, 6, and 8—

**618**

in substance allege that the accused did wrongfully and unlawfully receive divers sums of money from various individuals "as compensation for calling . . . false bingo numbers" thereby enabling the various individuals to collect bingo prizes.

The basic questions involved in this case are two: (1) Do the specifications allege acts which, under the holding in United States v Norris, 2 USCMA 236, 8 CMR 36, necessitate their being charged under Article 121, Uniform Code of Military Justice, 10 USC § 921, rather than Article 134? and (2) Are the acts alleged in the various specifications directly prejudicial to good order and discipline or the type which reflect discredit upon the armed forces?

The accused advances the following arguments: The Government cannot take an act which sounds in larceny—here urged by the accused as wrongful conversion—strip from it an essential element required by Article 121, and try the remainder under Article 134. According to the accused, the offenses lie outside the scope of Article 134 for the reason that Article 121 has covered the field of criminal conversion for military law. In addition, the offenses are too remote in their prejudicial effect upon military discipline. Cited in support of this argument is United States v Norris, supra. It was stated in that case:

> "It is our view that . . . Article 134 should generally be limited to military offenses and those crimes not specifically delineated by the punitive Articles . . . As the Manual itself notes, there is scarcely an irregular or improper act conceivable which may not be regarded as in some indirect or remote sense prejudicing military discipline under Article 134 . . . We cannot grant to the services unlimited authority to eliminate vital elements from common law crimes and offenses expressly defined by Congress and permit the remaining elements to be punished as an offense under Article 134.
>
> "We are persuaded, as apparently the drafters of the Manual were, that Congress has, in Article 121, covered the entire field of criminal conversion for military law."

The essential elements of the offenses in this case are different from those of larceny. Larceny is the wrongful taking, obtaining, or withholding of property of a certain value from the rightful owner with the intent to permanently deprive said owner thereof. The offenses alleged in specifications 1, 3, 5, and 7 are, while employed as a bingo caller, wrongfully and unlawfully awarding bingo prizes, knowing the numbers called to achieve those results to be false, and such conduct being prejudicial to good order and discipline or reflecting discredit on the armed forces. The offenses alleged in specifications 2, 4, 6, and 8 are, while employed as bingo caller, wrongfully and unlawfully using that position by knowingly calling false numbers because of prearranged plans for compensation, such conduct being to the prejudice of good order and discipline or reflecting discredit upon the armed forces.

The specifications first enumerated above pertain not to larceny but to the layman's understanding of cheating or dishonesty. The game, if played according to the rules of the club, make it a game of chance, and the players pay to play with that understanding. In a game of chance such as this, it is unknown whether or not the numbers actually drawn would have entitled a player to the prize. The element of chance, however, was eliminated by the accused, who conspired to give his co-conspirators the prizes. Had the accused been acting in an official capacity, he would have been guilty of receiving a bribe for the performance of an official act. Bishop defines bribery as "the voluntary giving or receiving of anything of value in corrupt payment for an official act, done or to be done." Bishop's Criminal Law, Vol 2, 9th ed, § 85. Of course we have no public duty involved here. What the accused did was not a common-law crime, nor one covered by one of the specific Articles of the Uniform Code of Military Justice. It was, however, clearly conduct prejudicial to good order and discipline

**619**

or the type reflecting discredit on the armed forces. See United States v Welch, 1 USCMA 402, 3 CMR 136. In re Welch, the accused was convicted of cheating on an examination. Although this case was reversed in this Court because of the denial of accused's privilege against self-incrimination and erroneous instructions by the law officer, there was no contention by counsel or holding by the Court that cheating was not an offense under the general Article.

As to specifications 2, 4, 6, and 8, see United States v Bey, 4 USCMA 665, 16 CMR 239, and United States v Alexander, 3 USCMA 346, 12 CMR 102. In the latter case we held that an allegation falling short of bribery was nonetheless a violation of Article 134, since such conduct was prejudicial to good order and discipline. Among other things in that case the accused was convicted of wrongfully and unlawfully receiving moneys as compensation for the transport of a Korean female in a Government vehicle. The Court there declared:

". . . It is contended, however, that the offense of misapropriation covers the entire wrongdoing. It seems reasonably certain that if a driver was in rightful possession of a Government vehicle he would be guilty of a disorder for improperly levying charges against passengers and we fail to see how the fact that he wrongfully appropriated the vehicle to his own use would change the act from one of disorder to one of order. . . . We suspect that if that practice were indulged in to any great extent, order and discipline in the military service would be nonextant. We, therefore, conclude the specification states an offense under Article 134, *supra.*

• • • • •

"Accused levels most of his argument against the instruction because it does not state all the elements of bribery. Having concluded that that offense was never placed in issue by the pleadings, we must test this instruction by the standards of a disorder. *Any irregular or improper act on the part of a member of the armed* services *which directly and substantially affects adversely the discipline or good order of the service may be made the subject of a charge. We, therefore, look to those acts enumerated in the instruction to determine if they are wrongful and if they would have any appreciable and adverse impact on order or discipline. We have no doubt that they do.*

• • • • •

". . . A comparison of the crime of graft as defined above and the one committed here shows a marked similarity. In the instant case, the following facts show the accused obtained personal gain without rendering compensatory service, because of the peculiar position occupied by him; the accused used Government property for his own pecuniary betterment; he had apparent authority to drive the vehicle; he clothed himself with the cloak of officiality by representing that he had a trip ticket to use the truck; he requested the payment of money knowing he would be using Government property unlawfully; and he accepted payment under circumstances showing a criminal intent. Clearly, he committed an offense which far exceeds a simple disorder and we are convinced it should be equated to graft." [Emphasis supplied.]

Likewise, in United States v Bey, supra, the Court had before it a specification not amounting to bribery but one somewhat similar to the specifications in the present case, in that a sergeant was convicted under Article 134 of the acceptance of money from a member of his platoon as compensation for obtaining a pass. The Court announced:

"Regardless of its description at the trial, it is apparent that the offense alleged is not bribery. The specification does not state, directly or by necessary implication, that the accused accepted the money with intent to influence his official action. This intent is an essential element of bribery, and the failure to allege it precludes conviction for that offense. United States v. Alexander, 3

USCMA 346, 12 CMR 102. Government appellate counsel have conceded this deficiency in the specification. Nevertheless, they contend that the allegations of the specification are still legally sufficient to state an offense under Article 134, supra. We agree.

"The specification in this case is substantially the same as that in United States v. Alexander, supra, in which the accused was charged with wrongful acceptance of money to transport a girl in a Government vehicle. Although divided in opinion as to the maximum legal punishment that could be imposed in that case, the Court was unanimous in holding that the specification was sufficient to state an offense under the Uniform Code. It is plain that a platoon sergeant's acceptance of money from a member of his platoon for his services in obtaining a pass is inimical to good order and discipline.

• • • • •

". . . The acceptance of money by a platoon sergeant from a trainee-member of his platoon for services in procuring a pass is but little different from acceptance of gifts by a Government employee from persons with whom he is transacting official business. See: United States v. Marker, 1 USCMA 393, 3 CMR 127. Essentially, it smacks of graft, and is punishable as such."

In the above cases the Court ruled—despite the absence of allegations of acceptance of money with intent to influence official action—that the offenses were similar to graft and that Article 134 was violated. The latter offense has long been well-recognized in criminal law, both in civilian and military jurisdictions. There is nothing in the legislative history of the Code which would lead one to the belief that Congress intended to merge graft with larceny or misappropriation. A reference to Appendix 6c, Form 127, page 489 of the Manual for Courts-Martial, United States, 1951, discloses a suggested form for pleading the offense, and the Table of Maximum Punish-

ments, paragraph 127c, page 225 of the Manual, supra, recognizes it as a crime separate and apart from those defined in Article 121 of the Code. Substantially, therefore, the indicia we mentioned in Norris, supra, to support our conclusion that Congress occupied the conversion field are missing here. Therefore we must overrule the contention that they should have been charged under Article 121.

We next turn to the further argument advanced by the accused that the offenses alleged in this case do not fall within the scope of Article 134 since their prejudicial effect on good order and discipline is too indirect and remote. The Alexander and Bey cases, supra, involved the use of military equipment and the use of one's official position for personal gain, respectively. Perhaps the offenses in the case at bar are less direct in the sense of an official Government connection; however, they are more direct in their application to morale. Activities in the armed forces, such as officers and airmen's messes, are operated to a large extent with the view toward maintaining morale as an essential phase of discipline.

A glance at the Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, United States, 1951, will readily demonstrate the numerous offenses falling under Article 134; and this list is illustrative, not restrictive. We have in our cases also indicated the Article's wide coverage. In United States v Kirksey, 6 USCMA 556, 20 CMR 272, the Court noted that traditionally imprisonment for debt is abhorrent to American ideals of justice and fair play; however, service personnel are criminally liable for the dishonorable failure to pay their debts, for "members of the military community—easily identified through the wearing of the uniform—are inevitably grouped in the public mind as a class—with the result that a failure by one to discharge monetary responsibilities tends to brand all not only as criminal persons, but as poor credit risks as well, in the eyes of the civilian population."

In United States v Lowe, 4 USCMA

**621**

654, 16 CMR 228, Chief Judge Quinn, speaking for the Court, pointed out that drunkenness was discreditable conduct. The Court asserted, "We concede that, depending upon the particular statute, the offense is not punishable at all in the civilian community, unless it occurs in a public place . . . In the military, no such differentiation is made. In fact, in the military sphere, drunkenness in the privacy of one's own quarters is a punishable offense."

We find in this case that the accused's behavior was not only prejudicial to good order and discipline, but it further reflected discredit on the armed forces. Open messes of officers and enlisted personnel are semipublic and perform valuable functions for the service. The bingo games and entertainment have a direct impact upon the morale of our forces overseas. We cannot but conclude, therefore, that patent dishonesty by an employee in one of these organizations constituted improper acts and conduct which directly and substantially affected adversely the good order and discipline in the armed forces of the United States and did directly and substantially bring discredit upon the armed forces.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

I do not concur outright because I have some reservations about the correctness of measuring these offenses by the elemental test. The definition of larceny, as presently set out in the Code, includes several offenses which were previously separate and distinct from each other. Therefore, the elements may vary somewhat in that larceny can involve a wrongful taking (the usual version of the crime) ; a wrongful obtaining by false representations (larceny by fraud or trick) ; or a wrongful withholding (embezzlement). For that reason, the charge of larceny might conceivably embrace a charge of graft, and proof of the former might also establish the latter.

The reason I join my associates in affirming the board of review is that historically the offense of larceny has been distinguished from both graft and cheating, and in military law they have been regarded as separate crimes. There is nothing in the Code which remotely suggests an intent to merge the classes, and Judge Ferguson, speaking for the Court, mentions certain indicia which point away from the notion that any such purpose was contemplated by Congress or the President. Both cheating and graft are offenses which have a direct impact on discipline in the Services and are a discredit to them. They should be the subject of punishment, but they need not be considered and characterized as synonymous with larceny. Therefore, I find no reason to hold that Article 121 alone covers this field.

In the case at bar, it is distinctly arguable that the facts would have established larceny had the Government elected to allege that offense. However, the prosecution need not allege a transgression in its most serious aspect, and an accused is in no position to complain if the pleading benefits him by charging him with the lesser of several offenses. It appears to me that that principle underlies this prosecution.