UNITED STATES, Appellee,

v.

Private E1 Michael D. SLAUGHTER,
432–31–7554, United States Army,
Appellant.

ARMY 9401577.

U.S. Army Court of Criminal Appeals.

30 May 1995.

For Appellant: Captain Blair M. Jacobs,
JAGC, Major Roy H. Hewitt, JAGC (on
brief).

For Appellee: Colonel John M. Smith,
JAGC, Major Lyle D. Jentzer, JAGC, Captain Anthony P. Nicastro, JAGC, Captain J.
Key Schoen, JAGC (on brief).

Before GRAVELLE, JOHNSTON, and
MOGRIDGE, Appellate Military Judges.

OPINION OF THE COURT

GRAVELLE, Senior Judge:

In accordance with his pleas, the appellant
was convicted of two specifications of dishonorably failing to maintain sufficient funds to
cover numerous checks he wrote in violation
of Article 134, Uniform Code of Military
Justice, 10 U.S.C. § 934 (1988). A military
judge sitting as a general court-martial sentenced him to a bad-conduct discharge, confinement for eight months, and forfeiture of
all pay and allowances. The convening authority approved the adjudged sentence.

The appellant asserts that we must set
aside his conviction because public policy
prohibits the government from utilizing the
criminal law to punish the nonpayment of
gambling obligations. We disagree that public policy precludes the appellant's conviction
in this particular case.

## I. Background

The appellant, motivated by a gambling
compulsion, played the slot machines at the
Community Club at Camp Eagle, Wonju,
Korea. Over a two-month period he wrote a
series of thirty-three checks totaling $4854.00
at the Community Club (Specification 1) and
seven checks totaling $934.45 at the Army
and Air Force Exchange Service (Specification 2), knowing full well that he did not, and
would not, have sufficient funds on hand to
make good on the checks.[1] During the providence inquiry, he admitted that he cashed
the checks primarily to secure the funds to
satisfy the voracious appetite of the slot machines. He also said that he used some of
the proceeds of these checks, from time to

---

1. The government utilized two "mega-specs,"
each specification listing numerous individual
checks. *See United States v. Carter,* 21 M.J. 665
(A.C.M.R.1985). *See also United States v. Oliver,*
1995 WL 234547 (AF Ct.Crim.App. 12 Apr. 1995)
(using the term "multi-spec" for this method of
pleading). Of the thirty-three checks alleged in

Specification 1, thirty-two of the checks are each
in the amount of $150.00, and the remaining
check is in the amount of $54.00. Of the seven
checks alleged in Specification 2, six are in the
amount of $150.00, and the remaining check is
in the amount of $34.45.

time, to purchase food at the Community Club.

## II. Law

As a general proposition, the United States Court of Appeals for the Armed Forces [2] has refused to allow the sanctions of the military criminal law to be used as a means of enforcing the payment of gambling debts. *See generally United States v. Walter,* 8 U.S.C.M.A. 50, 23 C.M.R. 274 (1957). This public policy decision, however, has its limits. The court has recognized that a gambler is not immunized from prosecution for an otherwise illegal act committed by him in the course of gambling. *United States v. Lenton,* 8 U.S.C.M.A. 690, 25 C.M.R. 194 (1958) (citing *United States v. Holt,* 7 U.S.C.M.A. 617, 23 C.M.R. 81 (1957)). In *Lenton,* the court recognized that "not every money transaction between the participants in a gambling game can be considered a part of the game." *Lenton,* 8 U.S.C.M.A. at 693, 25 C.M.R. at 197. "The critical question in these cases is whether the alleged act of misconduct is part of, or separate from, participation in the illegal game." *Id.* If the check transaction is "entirely separate" from the gambling activity, an accused cannot disclaim responsibility for the check on the grounds that it is a gambling debt. In *Lenton,* our superior court set aside Lenton's guilty plea to dishonorably failing to pay a debt when the facts showed that Lenton's checks were given for an "equivalent value of poker chips" during the course of two poker games. *Lenton,* 8 U.S.C.M.A. at 692, 25 C.M.R. at 196.

The appellant points to *United States v. Wallace,* 15 U.S.C.M.A. 650, 36 C.M.R. 148 (1966), as support for his argument that his conviction cannot stand because it is contrary to public policy. *Wallace* is at first blush factually similar to the case before us. Ma-

jor Wallace became addicted to playing the slot machines at an Officers' Club in Germany. In order to purchase the quarters to feed the machines, he wrote checks knowing he did not have, and would not have, funds to make good on these checks. The Court of Military Appeals set aside Major Wallace's conviction, noting that "one of the parties to the wager [was] an instrumentality of the United States," and "[w]e will not ... lend the offices of the criminal law to the taking of punitive measures for the nonpayment of gambling obligations." *Wallace,* 15 U.S.C.M.A. at 653, 36 C.M.R. at 151. As recently as March 1994, the court acknowledged without discussion the policy considerations set out in *Wallace. See United States v. Woodcock,* 39 M.J. 104, 105 (C.M.A.1994).

## III. Analysis

At the outset, we note that, in the case before us, one of the two specifications involves checks written to the Army and Air Force Exchange Service. While this entity is an instrumentality of the United States, we find that it is not directly related to the gambling activity and cannot be considered "one of the parties to the wager." Therefore, even if the public policy concerns of *Wallace* were to apply in this case, those considerations would apply only to the specification involving appellant's checks written at the Community Club, the situs of the gambling activity.[3]

As to the checks written to the Community Club, we find *Wallace* to be inapposite. Despite its facial similarity, we find the facts in *Wallace* distinguish it from the case before us. Major Wallace's relationship with the Officers' Club was considerably closer than that admitted by the appellant in the case before us. In *Wallace,* there was apparent official participation in, and approval of, Ma-

---

**2.** Until 5 October 1994, known as the United States Court of Military Appeals.

**3.** We note that the Air Force Court of Criminal Appeals recently considered the same issue presented to us and questioned the continued validity of the public policy concerns expressed in *Wallace. United States v. Allbery,* 41 M.J. 501 (AF Ct.Crim.App.1994). We agree with the Air Force court that the world has changed considerably since *Wallace* was decided almost thirty

years ago. We wonder whether public policy continues to be a valid basis for voiding a servicemember's otherwise valid conviction for dishonorably failing to maintain sufficient funds in his checking account. *Wallace* creates a situation wherein a soldier can intentionally write checks with insufficient funds. If he wins at gambling, he makes good on the checks; if he loses, the criminal law will not punish him. This is a situation we find incongruous.

jor Wallace's indebtedness because of his gambling activities. The manager of the Officers' Club was well aware of Major Wallace's heavy involvement in gambling, and even considered Major Wallace's extensive gambling to be a welcome "donation" of money to the club. The club manager accepted "IOUs" from Major Wallace, which the major redeemed later by giving personal checks in their place. When his checks were returned by the bank, the manager, with the knowledge and approval of the club's Board of Governors, permitted Major Wallace to replace the dishonored checks with new checks. In short, the facts of *Wallace* show that the club provided more than just a check-cashing service to a customer. Rather, the club was involved directly and actively in the gambling activity to the point that it was in a general sense a "participant" in the gambling game.

We find one other significant difference between this case and *Wallace*. Unlike the case before us, *Wallace* was a contested case, wherein the relationship between the club and Major Wallace was fully developed on the record. The appellant in the case before us pleaded guilty.

When the appellant attacks a plea of guilty for the first time on appeal, we view the facts in the light most favorable to the government. *United States v. Hubbard*, 28 M.J. 203 (C.M.A.1989). We, as an appellate court, should not and "will not engage in post-trial speculation concerning the factual basis of guilty pleas." *United States v. McGowan*, 41 M.J. 406, 410 (1995); *United States v. Harrison*, 26 M.J. 474, 476 (C.M.A.1988).

The facts, as admitted by the appellant at trial and in his stipulation of fact, show no direct connection between the check-cashing services of the club and the gambling activity. Had the appellant wished to do so, he could have used the money he received for other purposes. Indeed, he did occasionally use the money to purchase food. The appellant disclosed no facts showing the degree of active involvement of the Community Club in his gambling activities as was evident in *Wallace*. In light of *Hubbard* and *McGowan*, we will not presume such facts. In short, we find no good reason in this particular case to interpose public policy to set aside the appellant's provident pleas of guilty.

The findings of guilty and the sentence are affirmed.

Judge JOHNSTON and Judge MOGRIDGE concur.